JAMES E. GRITZNER, Senior Judge *908 This matter comes before the court on a Motion to Dismiss (the Motion) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 18, filed by Defendants Kimberly Reynolds, Tom Miller, and Bruce Swanson (collectively, Defendants). Defendants request an order dismissing in its entirety the Complaint, ECF No. 1, filed by Plaintiffs Animal Legal Defense Fund (ALDF), Iowa Citizens for Community Improvement (CCI), Bailing Out Benji, People for the Ethical Treatment of Animals, Inc. (PETA), and Center for Food Safety (CFS) (collectively, Plaintiffs). Defendants argue that Plaintiffs lack standing to bring their claims and also fail to state a claim for violation of their constitutional rights. No party requested oral argument, and the Court finds oral argument is unnecessary. The matter is fully submitted and ready for disposition.
I. BACKGROUND[1]
A. Undercover Investigations at Iowa Agricultural Production Facilities
Undercover investigations have long been an important tool used by journalists and advocacy groups to gather information about the inner workings of slaughterhouses and other agricultural facilities. Because Iowa is the nation's largest producer of pork and eggs, as well as a major source of other animal products, agricultural facilities in Iowa have been subject to numerous such investigations in recent years. For example, a 2008 undercover investigation at an Iowa pig farm revealed instances of workers beating pigs with rods and sticking clothespins into pigs' eyes and faces, leading to criminal charges being filed against multiple employees. Undercover investigations in the 2000s at a kosher slaughterhouse in Iowa revealed instances of cows being slaughtered not in accordance with kosher practices, such as by having their tracheas removed with meat hooks while fully conscious, and cows remaining conscious for minutes after their throats had been slit. Similar undercover investigations in other states have resulted in felony convictions for cruelty to animals or have spurred formal investigations by federal and state regulators. Undercover investigations at agricultural production facilities document other issues besides animal cruelty, such as unsafe working conditions, improper food safety practices, violations of labor law, or violations of environmental law.
Most agricultural facilities, such as slaughterhouses, are not open to the public. Investigators have thus typically gained access to facilities by securing employment at the facilities through standard hiring channels. Investigators serve as regular employees performing the tasks demanded of them but also document activities in the facilities-such as animal cruelty, unsanitary conditions, pollution, sexual misconduct, and violations of labor law-using hidden recording equipment. Most undercover investigations use employees new to a facility rather than existing employees, who are often reluctant to become whistleblowers due to fear of retaliation, the risk of termination, and immigration concerns. Employers, meanwhile, seek to prevent undercover investigations by inquiring during the application process about whether a candidate has any connections to certain animal protection organizations. At other agricultural facilities, such as large-scale commercial dog breeding facilities, *909 undercover investigators instead pose as breeders or brokers to gain access.
B. Iowa Code § 717A.3A : Agricultural Production Facility Fraud
On March 2, 2012, former Iowa Governor Terry Branstad signed into law H.F. 589, 84 Gen. Assemb., 2nd Reg. Sess. (Iowa 2012), which criminalizes "agricultural production facility fraud." A person commits the crime of agricultural production facility fraud if the person willfully:
a. Obtains access to an agricultural production facility by false pretenses[, or]
b. Makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized.
Iowa Code § 717A.3A. An "agricultural production facility" is "an animal facility" as defined in the Iowa Code or a "crop operation property." Id. § 717A.1(3). An "animal facility" includes "a location where an agricultural animal is maintained for agricultural production purposes, including but not limited to a location dedicated to farming ..., a livestock market, exhibition, or a vehicle used to transport the animal," as well as animal research locations, veterinary facilities, kennels, and pet shops. Id. § 717A.1(5). An "agricultural animal" is defined to include "[a]n animal that is maintained for its parts or products having commercial value." Id. § 717A.1(1)(a).
The first conviction for violation of § 717A.3A is a serious misdemeanor, and a second or subsequent conviction is an aggravated misdemeanor. Id. § 717A.3A(2). A person can also be held criminally liable for conspiring to violate this statute or for aiding and abetting a violation. Id. § 717A.3A(3)(a).
Plaintiffs allege that § 717A.3A was introduced in response to past undercover investigations in Iowa, including a 2011 investigation at a pork plant in Kamrar, Iowa, that generated media coverage of footage of pigs and piglets being abused. The Complaint details a number of statements made by legislators and lobbyists in conjunction with the enactment of § 717A.3A. The then-president of the Iowa Senate stated that he supported the legislation to "make producers feel more comfortable." Compl. ¶ 51, ECF No. 1. Another senator supporting § 717A.3A said, "What we're aiming at is stopping these groups that go out and gin up campaigns that they use to raise money by trying to give the agriculture industry a bad name." Compl. ¶ 52. Another senator characterized § 717A.3A as "an attempt to protect agriculture." Compl. ¶ 54. Plaintiffs allege, on information and belief, that § 717A.3A received support in the legislature because it would silence animal protection organizations.
C. Plaintiffs and Their Interests in Undercover Investigations
Plaintiffs are a collection of national and local non-profit organizations that engage in advocacy that they allege is impaired by § 717A.3A.
1. ALDF
ALDF is a national non-profit animal protection organization "that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food." Compl. ¶ 26. ALDF provides legal assistance and training to law enforcement and promotes enforcement of civil and criminal laws and regulations concerning animal welfare, as well as legislative and industry reform.
*910 ALDF uses undercover investigations to provide information used in advocacy and outreach. ALDF has previously conducted undercover investigations at agricultural facilities across the country, including in Iowa. ALDF would like to conduct an investigation at an agricultural production facility in Iowa and has a "professional working relationship" with a licensed private investigator in the state. Compl. ¶ 26. Since the statute's enactment, § 717A.3A has prevented ALDF from engaging in any undercover allegations in Iowa. ALDF also alleges that § 717A.3A has diminished the supply of investigations conducted by others in Iowa, which impairs its litigation and outreach efforts.
As noted above, part of ALDF's organizational mission includes engaging in lobbying and litigation to promote its interests in animal welfare. ALDF alleges that it has had to spend significant resources lobbying and litigating against statutes such as § 717A.3A, detracting from the organization's ability to spend those resources in other ways in service of its organizational mission.
2. CCI
CCI is an Iowa non-profit organization that seeks to empower individuals to engage in grassroots advocacy. CCI engages in advocacy concerning clean water, environmental preservation, labor rights, racial justice, and immigrant rights. CCI's members include workers in agricultural facilities, and CCI has worked with such employees to document poor or unsafe working conditions in agricultural facilities. In 2012, for example, CCI collected photographic evidence of working conditions at a facility near Algona, Iowa, leading to OSHA citations against the facility. CCI alleges that in 2015, following the enactment of § 717A.3A, it refrained from conducting an investigation into whether an egg and poultry facility in Iowa required workers to pay for their own protective gear. CCI also alleges that § 717A.3A has chilled it from obtaining video of illegal dumping into Iowa waterways or Clean Water Act violations.
3. Bailing Out Benji
Bailing Out Benji is an Iowa non-profit organization that promotes the welfare of dogs and companion animals and raises awareness about puppy mills in the state. Prior to the enactment of § 717A.3A, Bailing Out Benji conducted undercover investigations into puppy mills by sending its volunteers to puppy mills, stating or implying that they were breeders or brokers, and collecting video or photographic evidence of animal abuse. Bailing Out Benji also previously used material gained from another organization's undercover investigations in its advocacy materials and public education activities. Bailing Out Benji alleges that it now no longer conducts undercover investigations or is able to use material gained from other organizations' undercover investigations in Iowa.
4. PETA
PETA is a national public charity pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). PETA seeks to protect animals from abuse, neglect, and cruelty, and engages in public education, advocacy, protest campaigns, and litigation. PETA conducts undercover investigations at agricultural facilities across the United States, including the investigations recounted above. PETA alleges that it is interested in conducting an employment-based undercover investigation at a specific Montgomery County, Iowa egg facility, having received a tip regarding conditions at the facility. Section 717A.3A prohibits this possible investigation. PETA also alleges, like ALDF, that it has had to divert resources to lobbying and litigation against § 717A.3A, detracting from the organization's other activities.
*911 5. CFS
CFS, also a national § 501(c)(3) non-profit organization, promotes safe food production practices and environmental protection. CFS engages in public education, advocacy, lobbying, and litigation as part of an agricultural animal program that seeks to promote transparency and accountability in the animal agricultural industry. CFS does not allege that it conducts undercover allegations but alleges that § 717A.3A prevents CFS from obtaining the sort of information that arises from undercover investigations conducted by others. CFS also alleges that § 717A.3A directly harms CFS's interest in transparency in agriculture. Finally, like ALDF and PETA, CFS alleges that it has had to divert resources to combat § 717A.3A and laws like it rather than use those resources to promote alternatives to industrial animal farming.
D. Procedural History
Plaintiffs filed their Complaint on October 10, 2017, alleging that § 717A.3A is unconstitutional on its face. In Counts One and Two, Plaintiffs allege that § 717A.3A violates the First Amendment both as a law that discriminates on the basis of content and viewpoint and as an overbroad criminal sanction. In Count Three, Plaintiffs allege that § 717A.3A was enacted due to animus toward animal rights groups, targets those groups, and violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs also allege that § 717A.3A burdens the exercise of a fundamental right (freedom of speech) in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiffs request a declaration that § 717A.3A is unconstitutional on its face and as applied to Plaintiffs and injunctive relief to prevent Defendants from enforcing the statute.
On December 11, 2017, Defendants filed the instant Motion. Defendants argue that Plaintiffs lack standing to challenge the constitutionality of § 717A.3A. Defendants also argue that Plaintiffs fail to state a claim for violation of the First Amendment or for violation of the Equal Protection Clause of the Fourteenth Amendment.
II. DISCUSSION
A. Standards for a Motion to Dismiss
Defendants move to dismiss pursuant to Rule 12(b)(1) on standing grounds. Standing is a "jurisdictional prerequisite" that the Court must address before addressing merits questions. City of Clarkson Valley v. Mineta, 495 F.3d 567, 569 (8th Cir. 2007). "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of [Article III]. This is the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To demonstrate constitutional standing, a plaintiff must show "(1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision in court." Carlsen v. GameStop, Inc., 833 F.3d 903, 908 (8th Cir. 2016) (cleaned up).[2]
Plaintiffs bear the burden to establish standing. Gerlich v. Leath, 861 F.3d 697, 704 (8th Cir. 2017). "[E]ach element [required to demonstrate standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. , with the manner and degree of evidence required at the successive stages of the litigation."
*912 Indigo LR LLC v. Advanced Ins. Brokerage of Am., Inc., 717 F.3d 630, 633 (8th Cir. 2013) (second alteration in original) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). "[W]hen a motion to dismiss is made on standing grounds the standing inquiry must, as a prerequisite, be done in light of the factual allegations of the pleadings." City of Clarkson Valley, 495 F.3d at 570. The standing inquiry is separate from an assessment of the merits of a plaintiff's claim. Red River Freethinkers v. City of Fargo, 679 F.3d 1015, 1023 (8th Cir. 2012).
Defendants also move for failure to state a claim under Rule 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id."Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679, 129 S.Ct. 1937.
B. Standing
Defendants argue that Plaintiffs, either as organizations or on behalf of their members, have failed to establish an injury in fact. "To establish an injury in fact, a party must 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " Gerlich, 861 F.3d at 704 (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ). Such actual or threatened injury must be "distinct and palpable, as opposed to merely abstract." Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (cleaned up). The district courts that have considered recent challenges to similar state statutes have had little difficulty finding standing for the challengers in those cases, some of whom are also Plaintiffs here. See Animal Legal Def. Fund v. Herbert, 263 F.Supp.3d 1193, 1200 (D. Utah 2017) (finding standing for ALDF and PETA to challenge similar Utah law); Animal Legal Def. Fund v. Otter, 44 F.Supp.3d 1009, 1017-18 (D. Idaho 2014) (finding standing for ALDF to challenge similar Idaho law).[3]
Because the First Amendment protects against not only direct censorship but the chilling of protected speech, a plaintiff making a First Amendment claim alleges an injury in fact "even if the plaintiff has not engaged in the prohibited expression as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences." Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 792 (8th Cir. 2004) ; see also St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 487 (8th Cir. 2006) ("When a party brings a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute chills the exercising of its right to free expression, the chilling effect alone may constitute injury."). "[A]ctual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law."
*913 Susan B. Anthony List v. Driehaus, --- U.S. ----, 134 S.Ct. 2334, 2342, 189 L.Ed.2d 246 (2014). Instead, a plaintiff establishes an injury in fact "where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " Id. (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ). Indeed, where the constitutionality of criminal statutes is at issue, the Eighth Circuit has encouraged those aggrieved by the law to seek declaratory judgments rather than "deliberately break the law and take his chances in the ensuing suit or prosecution," which "promotes good public policy by breeding respect for the law." Gaertner, 439 F.3d at 488.
Where an organizational plaintiff asserts standing on its own behalf, as Plaintiffs do here, the organization also may establish standing by demonstrating the "deflection" of its financial and human resources arising from the challenged action. Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co., 160 F.3d 433, 434-35 (8th Cir. 1998). "Self-inflicted" harms do not convey standing, but where an organization incurs expenditures to counter the effects of a defendant's alleged unlawful conduct, an organization sustains an injury in fact. People for the Ethical Treatment of Animals v. U.S. Dep't. of Agric., 797 F.3d 1087, 1096-97 (D.C. Cir. 2015). By contrast, injuries that consist of merely "a setback to the organization's abstract social interests" do not suffice to convey standing. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).
With respect to each Plaintiff, Defendants argue that Plaintiffs' claimed injuries are too remote and speculative to support standing. Defendants argue that Plaintiffs have failed to allege that any undercover investigations they wish to engage in are specifically imminent or likely to be successful. Though certain Plaintiffs allege generally that they would like to engage in such investigations, Defendants point out that Plaintiffs do not allege, among other facts, a specific facility they wish to investigate,[4] when the investigation will be undertaken and by whom, or any specific advocacy campaigns that have been frustrated by § 717A.3A. Defendants argue that Plaintiffs should have advanced any such undercover investigations further through the planning stage, including by identifying the target, securing an investigator, obtaining an employment application, and going "as far as the property line of the operation they have targeted." Defs' MTD Br. 8-9, ECF No. 19-1.
Defendants discuss two cases at length: People for the Ethical Treatment of Animals, Inc. v. Stein, 259 F.Supp.3d 369 (M.D.N.C 2017), appeal docketed, No. 17-1669 (4th Cir. May 26, 2017); and St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481 (8th Cir. 2006). In Stein, the plaintiffs, including PETA and ALDF, challenged a North Carolina statute granting a private cause of action for damages by owners or operators of private property against any person, including an employee, who intentionally enters nonpublic areas and engages in unauthorized conduct, including unauthorized filming or recording. Stein, 259 F.Supp.3d at 372. As here, the plaintiffs alleged that they had previously conducted undercover investigations in North Carolina and would continue to do so if not for the challenged statute, while other plaintiffs alleged that their advocacy *914 activities depended on information derived from undercover investigations. Id. at 373-74. The district court, ruling on a motion to dismiss, found that the plaintiffs had not established standing at the pleading stage for a facial First Amendment challenge to the statute, because it was too conjectural whether any individual property owner would ever sue plaintiffs using this private right of action. Id. at 379.[5] The district court contrasted this private right of action with a regulatory action, enforced by the state:
But while it is reasonable to assume that the legislature intended an act to be enforced where it grants the State enforcement power, the same cannot be said when the act is not regulatory but creates only a potential civil cause of action available to any number of employers, public and private, without authorizing any particular State actor to enforce it.
Id. at 380.
In Gaertner, by contrast, the plaintiffs challenging a Minnesota election law had "asserted six specific political expenditures that they would like to make." Gaertner, 439 F.3d at 485. The challenged law subjected violators to criminal sanctions. Id. at 484. While the Minnesota officials brought in as defendants had never prosecuted a person under the challenged statute or threatened a prosecution of the plaintiffs or other violators, the Eighth Circuit held that "there is no indication that the Minnesota Statutes have fallen into desuetude" and that the plaintiffs' fear of prosecution was reasonable. Id. at 486-87.
Defendants contend that this case more closely resembles Stein than it does Gaertner . Plaintiffs, Defendants argue, do not have the ability to cause a violation of § 717A.3A unilaterally. Instead, Plaintiffs must identify a target, that target must have a job opening, Plaintiffs must locate a qualified candidate willing to conduct an undercover investigation, the investigator must conduct the investigation and obtain the desired information, and then the State must be willing to prosecute Plaintiffs for such conduct. Citing Stein, Defendants argue this is all too speculative to support standing. See Stein, 259 F.Supp.3d at 382 (finding no standing where the allegations "reveal a string of events that are speculative, attenuated, and dependent in part upon the decisions of independent persons").
Plaintiffs, however, have alleged an intention to engage in conduct arguably affected with a constitutional interest but proscribed by the challenged statute, as well as a reasonable threat of prosecution under § 717A.3A. See Susan B. Anthony List, 134 S.Ct. at 2342. Plaintiffs ALDF, CCI, Bailing Out Benji, and PETA plausibly allege that they would conduct undercover investigations of agricultural production facilities but for § 717A.3A.[6] All of *915 these organizations have previously conducted undercover investigations at agricultural facilities.[7] See, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 15-16, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (finding plaintiffs had standing to bring pre-enforcement challenge to criminal statute where plaintiffs claimed they had previously engaged in the conduct prohibited by the statutes and would do so again absent the statute); Herbert, 263 F.Supp.3d at 1200 (similar). These Plaintiffs allege that they wish to conduct undercover investigations in Iowa but do not presently intend to do so because of § 717A.3A. That undercover investigations may be complex is not a bar to standing. Plaintiffs allege they routinely overcome any such complexity to conduct successful investigations. Because the First Amendment protects against the chilling of speech, it is not necessary for Plaintiffs to provide concrete operational blueprints-who, what, when, and where-for activities they do not intend to conduct when the entire basis for their claim is that the challenged law makes such activities illegal.[8] As the Tenth Circuit has explained,
A plaintiff who alleges a chilling effect asserts that the very existence of some statute discourages, or even prevents, the exercise of his First Amendment rights. Such a plaintiff by definition does not-indeed, should not-have a present intention to engage in that speech at a specific time in the future. It makes no sense to require plaintiffs simultaneously to say "this statute presently chills me from engaging in XYZ speech," and "I have specific plans to engage in XYZ speech next Tuesday."
Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc).[9]
Nor are Plaintiffs' claims premised on a mere " 'subjective' chill" that would be insufficient to make this dispute sufficiently concrete to support standing. See 281 Care Comm. v. Arneson, 638 F.3d 621, 627 (8th Cir. 2011) (holding that the decision to refrain from engaging in conduct must be "objectively reasonable" based on a "credible *916 threat of prosecution" (citations omitted) ). As previously noted, concerns over the chilling effects on speech are significantly more acute when a criminal sanction is involved rather than a civil cause of action. See Gaertner, 439 F.3d at 487 ; 281 Care Comm., 638 F.3d at 628 ("[P]laintiffs have standing to bring pre-enforcement First Amendment challenges to criminal statutes, even when those statutes have never been enforced. It is only evidence-via official policy or a long history of disuse-that authorities actually reject a statute that undermines its chilling effect." (citations omitted) ). The nature of the sanction alone materially distinguishes the present case from Stein . See Stein , 259 F.Supp.3d at 383 ("Where there is potential State action ... and a 'danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.' " (quoting Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) ) ). Additionally, "the threat of prosecution is greater under a statute enacted relatively recently," and § 717A.3A was enacted only a few years ago. See Gaertner, 439 F.3d at 486 (considering eighteen years to be a "relatively short time" since the enactment of the challenged statute). Plaintiffs have plausibly alleged that they reasonably decided to refrain from conducting undercover investigations and that they face a credible threat of prosecution. They have alleged an injury in fact sufficient to support standing.
Unlike the other four Plaintiffs, CFS does not allege that it engages in undercover investigations, so it does not allege that its injuries arise from being chilled from doing so. Instead, CFS alleges that it is injured by a reduced, or possibly eliminated, pipeline of information derived from undercover investigations in Iowa that it can use in its advocacy. This injury is necessarily more contingent than the injuries alleged by the Plaintiffs who seek to engage in prohibited conduct themselves, but not dramatically more so. "[W]here one enjoys a right to speak, others hold a 'reciprocal right to receive' that speech, which 'may be asserted' in court." Penn. Family Inst., Inc. v. Black, 489 F.3d 156, 165 (3d Cir. 2007) (per curiam) (quoting Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ). The First Amendment provides standing to "persons who are 'willing listeners' to a willing speaker who, but for the restriction, would convey information." Am. Civil Liberties Union v. Holder, 673 F.3d 245, 255 (4th Cir. 2011). The Complaint plausibly alleges the existence of at least four such willing speakers: the other four Plaintiffs. For the reasons described above, Plaintiffs have sufficiently alleged at the pleading stage that they would engage in undercover investigations in Iowa in the absence of § 717A.3A. CFS has plausibly alleged that it would use information derived from those investigations in its own speech. To the extent the other Plaintiffs also allege similar injuries, based on each party's ability to use information derived from other organizations' undercover investigations, those Plaintiffs have also alleged injuries in fact on this basis.
Plaintiffs also allege that they are injured from having to direct organizational resources toward combatting § 717A.3A. Defendants argue that such harm is "self-inflicted" and does not support standing. See Abigail Alliance for Better Access to Dev'l Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006) (holding that an organization whose "activities have been impeded" has a basis for standing, but an organization is not injured by expending resources to challenge a regulation in court). Plaintiffs' alleged injuries go *917 beyond the effort expended in this litigation. For example, ALDF alleges that some of its resources used for promoting animal welfare have been diverted toward advocating for the repeal of § 717A.3A. These are precisely the sort of injuries that suffice to confer organizational standing in this manner. See Havens, 455 U.S. at 378-79, 102 S.Ct. 1114 (holding that the allegation that an organization had to divert resources from providing counseling and referral services to low-income home seekers to countering alleged discriminatory housing practices constituted injury in fact, not "simply a setback to the organization's abstract social interest"); Abigail Alliance, 469 F.3d at 132-33 (allegation that organization had to divert resources from assisting individuals in accessing medical treatment to compliance with challenged regulations sufficed to establish injury in fact). Thus, Plaintiffs have also alleged standing based on diversion of organizational resources.
In addition to injury in fact, the Court finds that the Complaint satisfies the remaining aspects of constitutional standing. The alleged injuries in fact arise from the potential enforcement of § 717A.3A by Defendants and thus may fairly be traced to the conduct Plaintiffs seek to enjoin. Similarly, the relief requested-a declaration that § 717A.3A is unconstitutional, and an injunction prohibiting Defendants from enforcing it-would redress the alleged injuries in fact by removing the threat of legal sanction against Plaintiffs' undercover investigations and allowing Plaintiffs to reallocate their advocacy resources away from the repeal of § 717A.3A.
C. Failure to State a Claim: First Amendment
Plaintiffs allege that § 717A.3A violates the First Amendment in two ways: first, it is a content-or viewpoint-based speech restriction that fails the appropriate level of scrutiny, and second, it is overbroad. Defendants argue that the First Amendment claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) because the conduct prohibited by § 717A.3A does not command First Amendment protection.[10] Defendants contend that § 717A.3A regulates conduct, not speech, and to the extent § 717A.3A regulates speech, it only prohibits false statements that do not receive First Amendment protection. In resolving these claims at this early stage of the litigation, the Court is compelled to follow a delicate and disciplined analysis.
1. Whether § 717A.3A Regulates Speech
Defendants argue that what § 717A.3A prohibits is not speech at all and thus the statute warrants no First Amendment scrutiny. The First Amendment only protects "conduct that is inherently expressive." Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc., 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Conduct merely accompanied by speech is not protected simply because the speech is protected, id., nor does conduct generate First Amendment protection "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," id. at 62, 126 S.Ct. 1297 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949) ). A statute regulates conduct, not speech, when it affects what a person "must do ...
*918 not what they may or may not say. " Id. at 60, 126 S.Ct. 1297.
Though § 717A.3A regulates conduct to some extent, it also restricts speech. The statute does not merely prohibit obtaining unauthorized access to an agricultural production facility; it specifically prohibits doing so "by false pretenses." Iowa Code § 717A.3A(1)(a). Subsection (b) explicitly prohibits the making of a false statement in a specific context (applications for employment at an agricultural production facility). Id. § 717A.3A(1)(b). Section 717A.3A on its face regulates what persons "may or may not say" and thus is a restriction on speech. See Forum for Acad. & Inst'l Rights, 547 U.S. at 60, 126 S.Ct. 1297 ; see also Animal Legal Def. Fund v. Wasden, 878 F.3d 1184, 1194 (9th Cir. 2018) (holding that a similar Idaho statute cannot "be characterized as simply proscribing conduct").
This aspect of § 717A.3A is also what distinguishes the statute here from the civil and criminal sanctions discussed in many of the cases cited by Defendants. Implicitly analogizing § 717A.3A to ordinary trespass law, Defendants highlight cases in which courts rejected First Amendment defenses to application of trespass laws. In Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir. 1999), journalists secured employment at a retailer, videotaped non-public areas of the store, and were sued by the retailer for, inter alia , breach of duty of loyalty and trespass. Id. at 511. The Fourth Circuit affirmed the judgments against each journalist on the tort claims, rejecting their First Amendment defense. Id. at 522. The court held that the First Amendment did not apply because the civil causes of action were generally applicable and, importantly, did not actually prohibit any speech or expressive conduct. Id. at 521. In Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir. 1971), the plaintiff sued journalists for invasion of privacy after the journalists surreptitiously recorded the plaintiff in his home, having used false statements to obtain an invitation. Id. at 245-47. The Ninth Circuit held that the First Amendment did not provide a defense to an invasion of privacy action, observing that "publication is not an essential element of plaintiff's cause of action." Id. at 249. In neither Food Lion nor Dietemann did the application of generally applicable tort law constitute a regulation on speech implicating the First Amendment-even though the individuals committing the violations were allegedly doing so in service of First Amendment-protected speech. Those tort causes of action, as well as ordinary trespass law, see, e.g., Iowa Code § 716.7 (defining trespass), do not condition a violation on the creation of speech or other expressive activity. By contrast, one cannot violate § 717A.3Awithout engaging in speech. The Tenth Circuit made a similar distinction in Western Watersheds Project v. Michael, 869 F.3d 1189 (10th Cir. 2017), addressing a statute prohibiting individuals from entering private land to collect "resource data." Id. at 1193 (quoting Wyo. Stat. §§ 6-3-414 ). The Tenth Circuit observed that the First Amendment might not provide a defense to a trespass action if an individual were to enter private land for the purpose of collecting such information; however, the First Amendment does apply where a particular statute sets forth "differential treatment of individuals who create speech." Id. at 1197. Whether § 717A.3A restricts speech and thus implicates the First Amendment is a preliminary question to whether the First Amendment prohibits that restriction on speech, which the Court now addresses.
2. Whether § 717A.3A Is a Content-Based Restriction
In general, the First Amendment "demands that content-based restrictions *919 on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality." United States v. Alvarez, 567 U.S. 709, 716-17, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion) (alteration in original) (quoting Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 660, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) ). Content-based restrictions on speech are subject to strict scrutiny unless the speech falls into one of a number of categories of speech traditionally subject to restriction, commonly referred to as "unprotected speech." See United States v. Stevens, 559 U.S. 460, 469-70, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Such categories include incitement of "imminent lawless action," obscenity, defamation, or fraud. Alvarez, 567 U.S. at 717-18, 132 S.Ct. 2537. Even if speech is "unprotected," however, the government may not regulate such speech according to its viewpoint. See R.A.V. v. City of St. Paul, 505 U.S. 377, 383-86, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[T]he power to proscribe [speech] on the basis of one content element (e.g. , obscenity) does not entail the power to proscribe it on the basis of other content elements.").
The Court must first determine whether § 717A.3A is a content-based or content-neutral restriction. Content-based regulations are "those that target speech based on its communicative content." Reed v. Town of Gilbert, --- U.S. ----, 135 S.Ct. 2218, 2237, 192 L.Ed.2d 236 (2015). Content-based regulations include those that on their face "draw[ ] distinctions based on the message a speaker conveys." Id. at 2227. Similarly, a regulation that is content-neutral on its face is nevertheless content-based if it cannot be "justified without reference to the content of the regulated speech." Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ). By contrast, content-neutral regulations include (but are not limited to) regulations regarding the time, place, or manner of speech. See Ward, 491 U.S. at 791, 109 S.Ct. 2746.
Both regulations contained within § 717A.3A are content-based on their face. Subsection (a) explicitly distinguishes between a person who obtains access to an agricultural production facility by false pretenses and a person who obtains access by other means. Iowa Code § 717A.3A(1)(a). Subsection (b) distinguishes between a person who makes a true statement as part of an application for employment at an agricultural facility yet possesses an intent to commit an unauthorized act, and a person with the same intent who makes a false statement. Id. § 717A.3A(1)(b). To determine if a person has violated either of these provisions, one must evaluate what the person has said. This makes § 717A.3A a content-based restriction on speech.[11]
Some content-based restrictions are permitted as a restriction on one of "the few 'historic and traditional categories [of expression] long familiar to the bar.' " Alvarez, 567 U.S. at 717, 132 S.Ct. 2537 (quoting Stevens, 559 U.S. at 468, 130 S.Ct. 1577 ). Those categories include advocacy intended and likely to incite imminent lawless action, obscenity, defamation, fraud, speech integral to criminal conduct, "fighting words," child pornography, true *920 threats, and speech presenting a grave and imminent threat. Id. These categories of unprotected speech "have a historical foundation in the Court's free speech tradition." Id. at 718, 132 S.Ct. 2537 ; see also id. at 722, 132 S.Ct. 2537 ("Before exempting a category of speech from the normal prohibition on content-based restrictions ... the Court must be presented with 'persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription.' " (quoting Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 792, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) ) ).
The key question raised by the Motion is whether the false statements prohibited by § 717A.3A fall under an exception to First Amendment protection. Though the Supreme Court has stated on numerous occasions that false speech itself has no constitutional value, the Court has also clarified that there is no general exception to First Amendment protection for false statements because "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation." Id. at 718, 132 S.Ct. 2537. Synthesizing principles underlying its decisions finding no First Amendment protection for particular forms of false speech such as fraud or defamation, the plurality opinion in United States v. Alvarez, 567 U.S. 709, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012), set forth certain types of false statements that do not receive First Amendment protection. Those include false statements that cause "legally cognizable harm[s]" such as "an invasion of privacy or the costs of vexatious litigation," id. at 719, 132 S.Ct. 2537, false statements such as trademark infringement "made for the purpose of material gain," id. at 723, 132 S.Ct. 2537, and false statements "made to effect a fraud or secure moneys or other valuable considerations" such as "offers of employment," id.
Building from these examples, Defendants argue that the false statements prohibited by § 717A.3A do not receive First Amendment protection. Defendants assert that certain cases declining to extend First Amendment protection to defendants in trespass and other similar actions stand for the proposition that lies to gain access to private property are unprotected by the First Amendment. Defendants also argue that property owners incur a "legally cognizable harm" and a trespasser obtains a "material gain" when a person gains access to their property using false statements. Defendants also highlight the statement about "offers of employment" in Alvarez and argue that lies to obtain employment are not protected by the First Amendment.
The cases cited by Defendants to support their argument that false statements to gain access to private property constitute unprotected speech fail to support that point. Food Lion and Dietemann, discussed above, stand for the proposition that journalists may commit generally applicable trespass and invasion of privacy torts and cannot use the First Amendment as a defense simply because the torts were committed while engaging in journalism. Other cases cited by Defendants similarly stand for the point that generally applicable laws apply with full force to individuals who wish to engage in speech or expressive activity. See Bartnicki v. Vopper, 532 U.S. 514, 532 n.19, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) ("It would be frivolous to assert ... that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws." (quoting Branzburg v. Hayes, 408 U.S. 665, 691, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ); Hudgens v. NLRB, 424 U.S. 507, 521, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (holding that picketers had no First *921 Amendment entitlement to enter a private shopping center and distribute handbills contrary to the wishes of the property owner); State v. Lacey, 465 N.W.2d 537, 539-40 (Iowa 1991) (finding no First Amendment protection from criminal trespass action simply because defendants were distributing handbills while refusing to leave private property); Special Force Ministries v. WCCO Tel., 584 N.W.2d 789, 793 (Minn. Ct. App. 1998) ("There is no inherent conflict or tension with the First Amendment in holding media representatives liable for the tort of fraud or trespass."). Plaintiffs are not demanding a blanket entitlement to enter others' property without permission simply because they are engaging in advocacy. Nor do Plaintiffs contend that an intent to engage in protected First Amendment activity obviates the duty of loyalty an employee owes an employer under Iowa law. See Condon Auto Sales & Serv., Inc. v. Crick, 604 N.W.2d 587, 598-99 (Iowa 1999) (recognizing the "common law duty of loyalty which is implied in employment relationships"). Content-based restrictions on speech may be invalid under the First Amendment even if the government may also prohibit conduct that accompanies that speech. For example, the Supreme Court has held that a federal statute prohibiting the creation of "depiction[s] of animal cruelty" violated the First Amendment as a content-based restriction even where "the prohibition of animal cruelty itself has a long history in American law." Stevens, 559 U.S. at 464-65, 469, 482, 130 S.Ct. 1577 (emphasis added).
This distinction does not yet resolve whether false statements made in furtherance of undercover investigations, employment-based or otherwise, fit within one of the historic and traditional exceptions for protection from content-based restrictions. False statements, without more, are not unprotected speech. Alvarez, 567 U.S. at 718, 132 S.Ct. 2537. The false statements prohibited by § 717A.3A may yet qualify as unprotected speech if they are those that cause a "legally cognizable harm," or provide a "material gain" for the speaker, as recognized in Alvarez. See id. at 718, 723, 132 S.Ct. 2537. Defendants argue that the false statements prohibited by § 717A.3A result in a legally cognizable, trespass-type harm-interfering with the property owner's interest in controlling access to his property-that suffices under this framework. The other courts that have evaluated similar statutes in light of Alvarez have disagreed. See Wasden, 878 F.3d at 1195 (holding that misrepresentations to gain entry to private property did not convey a material gain on speaker); Animal Legal Def. Fund v. Herbert, 263 F.Supp.3d 1193, 1205 (D. Utah 2017) ("[S]omething more than access by misrepresentation seems necessary to cause trespass-related harm. The mere knowledge (or lack of knowledge, as the case may be) that an invited guest was less than truthful, without more, may cause some harm, but it is difficult to see how that harm alone becomes legally cognizable."); Animal Legal Def. Fund v. Otter, 44 F.Supp.3d 1009, 1022 (D. Idaho 2014) ("[T]he limited misrepresentations ALDF says it intends to make-affirmatively misrepresenting or omitting political or journalistic affiliations, or affirmatively misrepresenting or omitting certain educational backgrounds-will most likely not cause any material harm to the deceived party.").
The types of false statements historically unprotected by the First Amendment are those that cause "specific or tangible" injuries. Wasden, 878 F.3d at 1194 (citing Alvarez, 567 U.S. at 734-36, 132 S.Ct. 2537 (Breyer, J., concurring) ). Fraud, for example, requires a finding of actual damages on the part of the recipient of false speech. E.g., Dier v. Peters, 815 N.W.2d 1, 7 (Iowa 2012) ; see also *922 Alvarez, 567 U.S. at 734, 132 S.Ct. 2537 ("Fraud statutes, for example, typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."). Similarly, a defamation plaintiff must establish "some sort of cognizable injury," such as actual damage to reputation, not simply "[h]urt feelings alone." Schlegel v. Ottumwa Courier, 585 N.W.2d 217, 224 (Iowa 1998) (quoting Johnson v. Nickerson, 542 N.W.2d 506, 513 (Iowa 1996) ); see also Alvarez, 567 U.S. at 734, 132 S.Ct. 2537 ("Defamation statutes focus upon statements of a kind that harm the reputation of another or deter third parties from association or dealing with the victim.").[12]
Defendants argue that trespass-type harms are legally cognizable and significant for First Amendment purposes because such harms can support nominal damages. But nominal damage is just that-damage in name only.[13] A trespasser may enter a property unauthorized and interfere with a property owner's right to control who enters his property without causing any actual or material injuries to the property owner, as the cases cited by Defendants acknowledge. See, e.g., Food Lion, 194 F.3d at 518-19 (finding that resume misrepresentation to obtain a job did not constitute trespass, but subsequent unauthorized recording while on the job did breach the employees' duty of loyalty, affirming nominal damages award of $2.00); Desnick v. Am. Broad. Cos., 44 F.3d 1345, 1353 (7th Cir. 1995) ("Like testers seeking evidence of violation of anti-discrimination laws, the defendants' test patients gained entry into the plaintiffs' premises by misrepresenting their purposes .... But the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs that the law of trespass protects; it was not an interference with the ownership or possession of land."); cf. Herbert, 263 F.Supp.3d at 1203-05 (finding that trespass may cause legally cognizable harms in the situation where trespasser subsequently engages in tortious conduct that causes actual injury to the property owner, such as where a protestor poses as a customer and then illegally damages property, but not in others, such as where a restaurant critic conceals his identity for purposes of writing a review). The Ninth Circuit made a similar distinction in Wasden, rejecting the State's argument that "entry onto the property and material gain are coextensive," yet also holding that lies made to misappropriate records of an agricultural production facility do inflict a material, legally cognizable harm because theft of records involves tangible injury and material gain not present when a person merely trespasses and passively observes (or records) a scene. Wasden, 878 F.3d at 1195, 1199.
The allegations in the present case illustrate why the Supreme Court has rejected the "notion that false speech should be in a general category that is presumptively unprotected" from content-based restrictions.
*923 Alvarez, 567 U.S. at 722, 132 S.Ct. 2537 (plurality opinion). To categorically deny protection for false speech that may cause the nominal invasion of a legal right but that does not result in actual, material harm would result in overbroad restrictions on speech, creating undue chilling of valued First Amendment expression. As Plaintiffs allege, an animal rights organization member could violate subsection (a) of the statute by obtaining access to a puppy mill auction by stating or implying that he or she was a breeder or pet broker. That individual might then surreptitiously take photographs or audio or video recordings, or perhaps simply take mental notes regarding what that person observed of the animals or their conditions. Under this scenario, the property owner may not have suffered any more than nominal damage arising from the false statements (or misleading omissions) at this point. That individual that made the false statements might subsequently make true statements, protected by the First Amendment, regarding what that individual saw or recorded, for example, in disclosure to the facility's customers, or in advocating legislation against puppy mills. While false statements of fact themselves are generally considered to be valueless, there are also many situations in which "lies will often cause little harm." Id. at 736, 132 S.Ct. 2537 (Breyer, J., concurring); see also Desnick, 44 F.3d at 1353 ("There was no eavesdropping on a private conversation .... There was no violation of the doctor-patient privilege. There was no theft, or intent to steal, trade secrets; no disruption of decorum, of peace and quiet; no noisy or distracting demonstrations."). Other false statements may "serve useful human objectives" by facilitating truthful discourse or by helping others realize the truth. Alvarez, 567 U.S. at 733, 132 S.Ct. 2537. Overbroad prohibitions on false statements harm First Amendment values by chilling true statements. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Put another way, "[t]he First Amendment requires that [courts] protect some falsehood in order to protect speech that matters." Gertz v. Robert Welch, Inc., 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
Here, Plaintiffs have alleged that § 717A.3A criminalizes the telling of lies that, by themselves, not only cause merely nominal harm but that also facilitate core First-Amendment speech regarding issues of public import. Cf. Bernbeck v. Moore, 126 F.3d 1114, 1116 (8th Cir. 1997) (applying strict scrutiny where regulation, in effect, substantially inhibited individuals' ability to engage in "core political speech"). Defendants identify no authority for the proposition that content-based speech restrictions-as opposed to application of generally applicable regulations on conduct, such as trespass-targeting false statements of fact that do not result in actual damages "have a historical foundation in the Court's free speech tradition." See Alvarez, 567 U.S. at 717, 132 S.Ct. 2537 (plurality opinion) (listing exceptions to protection that require a finding of, at least, a significant likelihood of harm); United States v. Williams, 690 F.3d 1056, 1063 (8th Cir. 2012) (finding it relevant that "[t]hese statutes criminalize only those lies that are particularly likely to produce harm," including hoax bomb reports). The Court must conclude that nominal damage a property owner sustains from an unconsented entry to property, without more, does not generate the type of "material gain" required under Alvarez for the false statements that § 717A.3A prohibits to qualify for an exception from the "normal prohibition on content-based restrictions." See Alvarez, 567 U.S. at 722-23, 132 S.Ct. 2537.
Thus, at least with respect to subsection (a), § 717A.3A appears to prohibit false speech that, under Alvarez , does not *924 fall within an exception to First Amendment protection. Defendants offer another argument specific to subsection (b), which is that under Alvarez false statements to obtain employment specifically do not command First Amendment protection. Indeed, the Alvarez plurality opinion states, "Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment , it is well established that the Government may restrict speech without affronting the First Amendment." Id. at 723, 132 S.Ct. 2537 (emphasis added). In Wasden, the Ninth Circuit confronted an Idaho statute, similar to subsection (b) of § 717A.3A, which prohibited obtaining employment at an agricultural production facility by misrepresentation. Wasden, 878 F.3d at 1201. The Ninth Circuit found that the speech prohibited by the Idaho provision fell within an exception to First Amendment protection because lying to gain employment results in a material benefit to the speaker. Id.
However, the Ninth Circuit placed great emphasis on the intent prong of the Idaho statute at issue in Wasden, and there the statute differs materially from § 717A.3A. The Idaho statute criminalized knowingly obtaining employment via misrepresentation " 'with the intent to cause economic or other injury' to the facility's operations, property, or personnel." Id. at 1201 (quoting Idaho Code § 18-7042(1)(c) ). This intent provision cabined the application of the Idaho statute so that it only criminalized the sort of false statements that the plurality in Alvarez recognized the government may target with content-based restrictions: those likely to cause material harm to others. See id. at 1201-02. By contrast, subsection (b) of § 717A.3A only requires that the person making the misrepresentation in their employment application have "an intent to commit an act not authorized by the owner ... knowing that the act is not authorized." Iowa Code § 717A.3A(1)(b). This prohibition sweeps much more broadly and on its face requires no likelihood of actual, tangible injury on the part of the recipient of false speech. While the Iowa statute's intent requirement does inoculate against some "innocent" or accidental misrepresentations, it is not clear that simply because an act is not authorized by an employer, commission of that act causes the sort of material harms contemplated in the Alvarez plurality opinion. Nor does subsection (b) of § 717A.3A require that any false statements made as part of an employment application be material, further distinguishing this provision from a prohibition on fraud. Cf. Alvarez, 567 U.S. at 734-35, 132 S.Ct. 2537 (Breyer, J., concurring) (prohibitions on fraud, perjury, and lying to government officials, which punish speech falling outside of First Amendment protection, typically require materiality). Plaintiffs allege that the misrepresentations their undercover investigators tell relate to their affiliation with animal protection organizations, their status as licensed private investigators (where applicable), and innocuous white lies. Plaintiffs allege that their investigators do not lie about their job qualifications and relevant experience (e.g. , forklift experience), and allege that their investigators perform their jobs identically to "bona fide" employees while also wearing hidden recording equipment. Defendants do not explain how the misrepresentations offered by such employees could "effect a fraud," see id. at 723, 132 S.Ct. 2537 (plurality opinion), absent actual damages suffered by the employer. This is particularly so if the misrepresentations are not material, as the statute does not require them to be.[14] Defendants suggest *925 that a "false friend" employee would breach their duty of loyalty to the employer, but that also does not necessarily establish the existence of any more than a nominal harm to the employer. See Food Lion, 194 F.3d at 517-18 (undercover investigators' breach of the duty of loyalty to employer resulted in only nominal damages). For the Court to find that subsection (b) of § 717A.3A prohibits no speech protected by the First Amendment, as the Motion contends, the Court would have to conclude that the reference in Alvarez to offers of employment means that the First Amendment allows for government prosecution of all misrepresentations made to secure employment, whether material or not, and irrespective of any actual damage suffered by the employer. The remainder of the Supreme Court's jurisprudence cautions against the assumption of any such "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." Alvarez, 567 U.S. at 722, 132 S.Ct. 2537 (quoting Stevens, 559 U.S. at 473, 130 S.Ct. 1577 ). This Court will thus decline Defendants' invitation to interpret the First Amendment accordingly.
Having come this far, this Court observes that Defendants did not move to dismiss on the grounds that § 717A.3A satisfies the appropriate level of constitutional scrutiny for content-based restrictions or is not unconstitutionally overbroad. The above discussion suffices to resolve the question of whether Plaintiffs have stated a claim for violation of the First Amendment. Thus, the Court does not determine whether § 717A.3A violates the First Amendment, as that ultimate issue is not before the Court on this Motion.
3. Whether § 717A.3A Is a Viewpoint-Based Restriction
Plaintiffs also resist Defendant's Motion with respect to the First Amendment claims by arguing that § 717A.3A is a viewpoint-based restriction on speech. Plaintiffs argue that § 717A.3A is a viewpoint-based restriction because it singles out speech critical of the agricultural industry. This argument warrants brief discussion as it provides an independent reason Plaintiffs' First Amendment claims survive the Motion.
"Government discrimination among viewpoints-or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'-is a 'more blatant' and 'egregious form of content discrimination.' " Reed, 135 S.Ct. at 2230 (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ). As noted above, where a regulation distinguishes speech based on its viewpoint, such a regulation is subject to strict scrutiny even if the speech in question falls under one of the exceptions to First Amendment protection. E.g., R.A.V., 505 U.S. at 386-89, 112 S.Ct. 2538. Restrictions on speech are viewpoint-based where they distinguish between speech based on "the specific motivating ideology or the opinion or perspective of the speaker," Reed, 135 S.Ct. at 2230 (quoting Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510 ), or "proscribed views on particular disfavored subjects and suppressed distinctive ideas conveyed by a distinctive message,"
*926 Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 582, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (cleaned up).
On its face, § 717A.3A does not discriminate between particular viewpoints. The statute prohibits certain false statements without regard to the ideology or perspective of the speaker. However, a law discriminates based on viewpoint whenever "the government has singled out a subset of messages for disfavor based on the views expressed," and it need not do so explicitly. See Matal v. Tam, --- U.S. ----, 137 S.Ct. 1744, 1766, 198 L.Ed.2d 366 (2017). Where the government enacts a law with the purpose of suppressing a particular viewpoint, it is a viewpoint-based restriction on speech. Reed, 135 S.Ct. at 2238 (Kagan, J., concurring in the judgment) ("[S]ubject-matter restrictions, even though viewpoint-neutral on their face, may 'suggest[ ] an attempt to give one side of a debatable public question an advantage in expressing its views to the people.' " (quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ) ); Vieth v. Jubelirer, 541 U.S. 267, 314-15, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring in the judgment) ("First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." (emphasis added) ); Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 811, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."). The Complaint alleges that the Iowa Legislature, in enacting § 717A.3A, did so to stifle viewpoints critical of modern large-scale agricultural animal production methods. The Complaint contains examples of statements from legislators disparaging animal activists in connection with the proposed legislation. Section 717A.3A, consistent with this alleged intent, only applies to false statements made at agricultural facilities, and not to other private property in any other industry that might be targeted by undercover investigators who are not animal activists, such as food service establishments or childcare facilities. At the motion to dismiss stage, Plaintiffs have plausibly alleged an intent to disfavor a subset of messages based on their viewpoint.
D. Failure to State a Claim: Equal Protection
Plaintiffs set forth two theories as to why § 717A.3A violates the Fourteenth Amendment's Equal Protection Clause. First, the statute burdens the fundamental right of free speech; and second, the statute sets forth an impermissible classification motivated by animus against animal activists. The above discussion concerning First Amendment protection for the speech prohibited by § 717A.3A addresses the former theory, as the First Amendment only applies to Defendants via the Fourteenth Amendment. Regarding the second theory, Defendants argue that § 717A.3A is rationally related to the legitimate government interest of protecting private property from unwanted intrusions and that Plaintiffs have failed to allege any animus.
"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from denying 'to any person within its jurisdiction the equal protection of the laws.' " Walker v. Hartford Life & Accident Ins. Co., 831 F.3d 968, 976 (8th Cir. 2016) (quoting U.S. Const. amend. XIV, § 1 ). The Equal Protection Clause does not "guarantee that all persons must be dealt with in an identical manner," id. (quoting *927 Mills v. City of Grand Forks, 614 F.3d 495, 500 (8th Cir. 2010), nor forbid statutory classifications, but instead "keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike," id. (quoting In re Welfare of M.L.M., 813 N.W.2d 26, 37 (Minn. 2012) ). Where a law does not burden a fundamental right or target a suspect class for disparate treatment, courts apply rational basis review to an equal protection challenge. Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999). Suspect classifications include race, alienage, gender, and national origin. Id. The Complaint does not allege that § 717A.3A implicates a suspect classification.
Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Typically, the party challenging the law bears the burden to "negative every conceivable basis which might support it." Armour v. City of Indianapolis, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ). A law may satisfy rational basis review "if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer v. Evans, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). However, the Supreme Court has stated that if a law is motivated by animus, or "a desire to harm a politically unpopular group, [the Court has] applied a more searching form of rational basis review." Lawrence v. Texas, 539 U.S. 558, 580, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ; see also United States v. Windsor, 570 U.S. 744, 133 S.Ct. 2675, 2696, 186 L.Ed.2d 808 (2013) ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure [persons in same-sex marriages]."); cf. Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 692 (6th Cir. 2011) (observing that in cases in which the Supreme Court found animus, the Court found a constitutional problem after "conclud[ing] that the legislation at issue was in fact intended to further an improper government objective").
Defendants argue that individual statements from legislators do not suffice to allege animus on the part of the state legislature as a whole. Plaintiffs argue that the Supreme Court has found animus based on a single legislator's comment about "hippies," see U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), and based on three statements in a House Report, see Windsor, 133 S.Ct. at 2693. This focus on legislators' statements ignores the most relevant factor in determining whether a statutory classification was motivated by animus: the text of the challenged legislation. The Supreme Court's conclusions about animus have sprung not from isolated statements-though such statements could constitute evidence-but from the incongruous or overtly discriminatory text of the challenged laws themselves. In Romer, for example, the Supreme Court observed that the Colorado statute's imposition of "broad and undifferentiated disability on a single named group" was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." Romer, 517 U.S. at 632, 116 S.Ct. 1620 (emphasis added); see also id. at 634, 116 S.Ct. 1620 (finding the inference of animus to be "inevitable"). In Cleburne, the Court found that the government's justifications were so unrelated to the challenged ordinance that the ordinance "appears ... to rest on an irrational prejudice against the mentally retarded."
*928 Cleburne, 473 U.S. at 450, 105 S.Ct. 3249.
By contrast, the text of § 717A.3A contains no classification targeting animal welfare activists. Given that some of the Plaintiffs in this action, CCI and CFS, are advocacy organizations that are not primarily engaged in animal-rights advocacy, it is clear that § 717A.3A applies both to animal welfare activists and even other types of activists in equal measure. Instead, the only classification between different persons contained in the text of the statute is the singling-out of agricultural protection facilities for special protection. Though Plaintiffs imply that singling out one industry for protection implies animus towards those activists who seek to criticize that industry, it might also simply signify solicitude for a particular industry.[15] Plaintiffs provide no authority for the proposition that protection for one favored group would necessarily signify animus for those opposed to that favored group, even if legislators have negative things to say about the group opposed to the favored group. See Bishop v. Smith, 760 F.3d 1070, 1099-1100 (10th Cir. 2014) (defining animus as a continuum of "hostility toward a particular group" with "a desire to harm a politically unpopular group" at one end and "the urge to call one group 'other,' to separate those persons from the rest of the community" at the other end (citation omitted) ). Even on a motion to dismiss, and taking into consideration the statements highlighted in the Complaint, Plaintiffs have failed to plausibly allege that § 717A.3A is "inexplicable by anything but animus toward the class it affects." See Romer, 517 U.S. at 632, 116 S.Ct. 1620 ; accord Wasden, 878 F.3d at 1201 ("Subsection (b) does not offend the Equal Protection Clause because it does not rest exclusively on an 'irrational prejudice' against journalists and activists." (quoting Cleburne, 473 U.S. at 450, 105 S.Ct. 3249 ) ).
Section 717A.3A satisfies rational basis review. Defendants have identified legitimate governmental objectives in preventing trespasses at operating industrial facilities, in this case agricultural production facilities, and in preventing fraud in employment. See Moreno, 413 U.S. at 536, 93 S.Ct. 2821 (preventing fraud is a legitimate governmental interest); Jobe v. City of Catlettsburg, 409 F.3d 261, 268 (6th Cir. 2005) (referring to government interest in helping individuals have their property "left alone by those who do not have permission to use it").[16] Though Plaintiffs have plausibly alleged that the statute's restrictions on speech implicate the First Amendment, for purposes of the Fourteenth Amendment's Equal Protection Clause the statute addresses these legitimate government objectives.
III. CONCLUSION
Based on the foregoing, Defendants' Motion to Dismiss, ECF No. 18, must be *929 granted in part and denied in part . The Motion must be granted with respect to the portion of Count III pled pursuant to the Equal Protection Clause of the Fourteenth Amendment and otherwise denied.
IT IS SO ORDERED.

On consideration of the Motion, this Court is required to assume the facts alleged in the Complaint to be true. See United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012).

The parenthetical "(cleaned up)" may be used "when extraneous, residual, non-substantive information has been removed" from a citation. E.g., United States v. Steward, 880 F.3d 983, 986 & n.2 (8th Cir. 2018).

The defendants in Otter appear not to have raised the district court's standing ruling on appeal. See generally Animal Legal Def. Fund v. Wasden, 878 F.3d 1184 (9th Cir. 2018) (reviewing district court's grant of summary judgment but not its findings on standing).

PETA, however, has alleged that it seeks to investigate a particular Montgomery County egg production facility.

The Attorney General of North Carolina was named as a defendant in this case, but only because the Attorney General would be the person bringing a civil suit on behalf of the University of North Carolina system in its capacity as owner or operator of premises such as university laboratories. Stein, 259 F.Supp.3d at 373, 379-80. The district court found it implausible that the plaintiffs could imminently start an undercover investigation at a university laboratory specifically-the success of such an investigation was too contingent on the involvement of third party investigators who the plaintiffs had not identified. Id. at 382-83.

Though Defendants' arguments focus on employment-based investigations, violations of subsection (1)(a) of § 717A.3A are not limited to employment-based investigations; the provision covers any access obtained by false pretenses. This would include, for example, Bailing Out Benji's allegations that it has, and would like to continue, sending its volunteers to suspected puppy mills under the guise of being a breeder. Thus, many of the contingencies Defendants highlight do not apply in the context of a violation of subsection (a).

Though such an allegation would not be necessary to establish standing, these four Plaintiffs allege they have previously conducted undercover investigations in Iowa.

Defendants contend that because PETA alleges it has received information from fifteen whistleblowers, it is able to conduct the investigations it seeks to conduct using existing employees rather than applicants who would violate § 717A.3A. Plaintiffs, however, do not allege that any such current-employee whistleblowers who have contacted PETA have ever been willing to engage in clandestine video or audio recording or to take any further action in gathering information. Rather, the Complaint alleges that existing employees at agricultural facilities often bear precarious economic and immigration situations. This means that existing employees are seemingly less suitable for undercover investigations compared to investigators working with Plaintiffs from the outset who do not depend on employment at the facility to make a living.

Moreover, though doing so is not necessary to establish standing, Plaintiffs have in fact alleged some of the operational details that Defendants claim are missing. PETA, for example, has identified a specific facility that it seeks to investigate. ALDF alleges that it has a relationship with a private investigator in Iowa that it would like to use for undercover operations. Defendants raise no more than metaphysical doubt that the agricultural facilities that Plaintiffs would target with an investigation would not have open positions for which Plaintiffs could locate a qualified and willing candidate. Plaintiffs plausibly allege that they have the ability to provide qualified candidates for these jobs, that such jobs open frequently, and that Plaintiffs' candidates obtain them-particularly given that Plaintiffs have done so in the past.

The First Amendment applies to Defendants, in their official capacities serving the State of Iowa, as incorporated by the Fourteenth Amendment. E.g., Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

Contrary to Defendants' suggestion, in Wasden the Ninth Circuit did not hold that the Idaho statute in question was not a content-based restriction on speech. In that case, the court was confronted with a statute that, in part, criminalized obtaining records of an agricultural production facility or employment at such a facility by misrepresentation. Wasden, 878 F.3d at 1193. As set forth in greater detail below, the Ninth Circuit held that these content-based provisions did not regulate constitutionally protected speech, not that the provisions were content-neutral. See id. at 1200-01.

Other restrictions on false speech that are generally recognized as constitutional require, for example, "falsehoods that tend to cause harm to a specific victim of an emotional-, dignitary-, or privacy-related kind," "circumstances where a lie is likely to work particular and specific harm," "proof that substantial public harm be directly foreseeable," or a showing of "confusion among potential customers (about the source [of a trademarked good] ), ... thereby diluting the value of the mark to its owner." Alvarez, 567 U.S. at 734-36, 132 S.Ct. 2537 (Breyer, J., concurring). The common thread through all these sanctions is the centrality of actual harm suffered by the recipient of the false speech.

See Damages, Black's Law Dictionary (10th ed. 2014) (defining "nominal damages" as "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated").

The lack of any materiality requirement also makes it significantly more likely that a bona fide employee who later wishes to act as a whistleblower would be chilled by a credible threat of prosecution under § 717A.3A. The State could rationally allege that a whistleblower who previously made any misstatement on his or her employment application and who, after becoming employed, decided to commit an act not authorized by the owner of the agricultural production facility (such as clandestinely photographing a serious violation of law) also possessed an intent to commit that act when he or she applied for the job.

Though such a motivation would likely not suffice to establish a legitimate governmental objective for purposes of rational basis review, see Animal Legal Def. Fund v. Otter, 118 F.Supp.3d 1195, 1210 (D. Idaho 2015), aff'd in part, rev'd in part by Wasden, 878 F.3d 1184 (9th Cir. 2018) ("Protecting the private interests of a powerful industry ... against public scrutiny is not a legitimate government interest."), absent a showing of animus Defendants may point to any other conceivable legitimate interest that rationally supports the statute without needing to prove that such interest actually motivated the legislature, see Armour, 566 U.S. at 681, 132 S.Ct. 2073.

Whether these interests are legitimate government interests is a different question than whether such an interest can support a content-based restriction on speech. See Klein v. City of San Clemente, 584 F.3d 1196, 1204 (9th Cir. 2009) (holding that city's "interest in preserving an individual's right to decide how and when their private property will be used" insufficient to justify restriction on speech).