JAMES E. GRITZNER, Senior Judge
This matter is before the Court on cross-motions for summary judgment. Plaintiffs Animal Legal Defense Fund (ALDF), Iowa Citizens for Community Improvement (CCI), Bailing Out Benji, People for the Ethical Treatment of Animals, Inc. (PETA), and Center for Food Safety (CFS) (collectively, Plaintiffs), filed the first motion, ECF No. 49, which Defendants resist. Defendants Kimberly Reynolds, Tom Miller, and Bruce Swanson (collectively, Defendants), filed the second motion, ECF No. 57, which Plaintiffs resist. The parties agree that this matter is appropriate for resolution by summary judgment with each contending they are entitled to judgment as a matter of law. No party requested a hearing, and the Court finds a hearing unnecessary. The matter is fully submitted and ready for disposition.
I. BACKGROUND[1]
Iowa created the crime of "agricultural production facility fraud," Iowa Code § 717A.3A, in 2012, on the heels of several industrial farm investigations that brought critical national attention to Iowa's agricultural industry. For example, in 2011, an undercover investigation at Iowa Select Farms produced reports of workers hurling small piglets onto a concrete floor.[2] Another investigation at Iowa's Sparboe Farms, documented reported mistreatment *817 of hens and chicks.[3] And yet another, conducted by PETA, exposed workers at a Hormel Foods supplier in Iowa "beating pigs with metal rods," "sticking clothespins into pigs' eyes and faces, and a supervisor kicking a young pig in the face, abdomen, and genitals to make her move while telling the investigator, 'You gotta beat on the bitch. Make her cry.' " Jeffrey S. Kerr Aff. ¶ 14, Pls.' App. 14, ECF No. 49-2. PETA's investigation, if not also the others, was an undercover, employment-based investigation in which the investigator also performed tasks assigned by the employer.
While the results of these investigations were being circulated by news media, the Iowa legislature considered H.F. 589, § 2 (Iowa 2012), which would eventually become § 717A.3A. Lawmakers described the bill as being responsive to two primary concerns of the agricultural industry: facility security (both in terms of biosecurity and security of private property) and harms that accompany investigative reporting.[4] For example, as to security, then-Representative Annette Sweeney provided: "With this bill we want to make sure everybody involved in our livestock facilities and working within in those facilities is forthright, and want to make sure our livestock is being kept safe,"[5] and then-Senate President John "Jack" Kibbie supported an early draft of the bill because "[t]here's viruses that can put these producers out of business, whether it's cattle, hogs or poultry."[6] As to reputational harms, former Senator Tom Rielly commented on a draft version of the bill: "What we're aiming at is stopping these groups that go out and gin up campaigns that they use to raise money by trying to give the agriculture industry a bad name."[7]
The bill, signed into law on March 2, 2012, amended chapter 717A of the Iowa Code, which already prohibited disrupting, destroying, or damaging property at an animal facility, id. § 717A.2 (2003), or on crop operation property, id. § 717A.3 *818 (2001), and also the use of pathogens to threaten animals and crops, id. § 717A.4 (2004). The new addition provides that a person commits "agricultural production facility fraud" if the person willfully:
a. Obtains access to an agricultural production facility by false pretenses[, or]
b. Makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized.
Iowa Code § 717A.3A (2012). A first conviction under § 717A.3A is a serious misdemeanor, and a second or subsequent conviction is an aggravated misdemeanor. Id. § 717A.3A(2). A person can also be held criminally liable for conspiring to violate this statute, aiding and abetting a violation, or harboring, aiding, or concealing the person committing the violation, "with the intent to prevent the apprehension of the person." Id. § 717A.3A(3)(a). The law has the effect of criminalizing undercover investigations of certain agricultural facilities, including those mentioned above, and those of interest to the general public, such as puppy mills.[8]
Iowa Code § 717A.3A is similar, and in parts identical, to other states' laws that prohibit conduct and speech related to agricultural operations. In fact, Iowa is one of many states that have passed or attempted to pass such legislation in the last decade. See, e.g., Animal Legal Def. Fund v. Herbert, 263 F.Supp.3d 1193, 1196-98 (D. Utah 2017) (providing a brief history of similar proposed and enacted legislation across the country). Of those in effect, several have been invalidated or limited based on First Amendment challenges. See W. Watersheds Project v. Michael, No. 15-CV-169-SWS, 2018 WL 5318261, at *10 (D. Wyo. Oct. 29, 2018) (invalidating, in part, a Wyoming statute criminalizing entry on private land for the purpose of resource data collection relating to land use, including animal species, as facially unconstitutional under the First Amendment); Herbert, 263 F.Supp.3d at 1211-13 (finding a Utah law, very similar to Iowa's law, criminalizing acts of obtaining access to agricultural operations under false pretenses and recording images at such operations under false pretenses, to be facially unconstitutional under the First Amendment); Animal Legal Def. Fund v. Otter, 118 F.Supp.3d 1195, 1200-09 (D. Idaho 2015) (finding an Idaho law criminalizing interference with agricultural production facilities to be facially unconstitutional under the First Amendment), aff'd in part, rev'd in part sub nom. Animal Legal Def. Fund v. Wasden, 878 F.3d 1184 (9th Cir. 2018) (reversing as to the portion of the law related to offers of employment).
Plaintiffs and their amici -Iowa Freedom of Information Council and Iowa Center for Public Affairs Journalism-frame this legislative trend within the context of an on-going tension between members of the news media and the agricultural industry. The amici describe an American public eager to consume news about the food they eat, and a responsive group of defenders *819 of the agricultural industry, understandably eager to have the news about them be positive, who have worked "to suppress any unflattering coverage of inhumane slaughterhouse practices, unsanitary factory conditions and worker abuses" through legislation such as § 717A.3A. Amici Curiae Br. 3, ECF No. 73. Plaintiffs and their amici argue that lawmakers, finding the First Amendment in the way of attempts to directly halt publication of these abuses, see, e.g., New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), have attempted to suppress information from reaching the press "by prosecuting newsgathering activities that serve as the foundation of investigative journalism," Amici Curiae Br. 3, ECF No. 73; Pls.' Br. 1, ECF No. 53. Defendants counter that § 717A.3A is about defending the private property rights of Iowans who own agricultural facilities.
A. The Parties
Plaintiffs are non-profit organizations that engage in advocacy and investigative work related to animal cruelty, wellbeing of workers, and safety of food supply. They state they would like to conduct undercover investigations, or use the results of others' investigations, but have not done so given the threat § 717A.3A would be enforced against them. Plaintiffs challenge § 717A.3A, arguing it impermissibly restricts their free speech under the First Amendment. Defendants are the Governor of Iowa, the Attorney General of Iowa, and the County Attorney for Montgomery County, who are sued in their official capacities and defend the constitutionality of § 717A.3A, arguing there is no First Amendment right to engage in the conduct prohibited by the statute.
B. Procedural History
Plaintiffs filed their Complaint on October 10, 2017, alleging that § 717A.3A is facially unconstitutional as a content-based, viewpoint-based, and overbroad regulation. Plaintiffs asserted claims under the First Amendment, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.
Defendants filed a Motion to Dismiss on December 8, 2017, under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), arguing the Plaintiffs lacked standing to bring their claims, and alternatively, that the Plaintiffs failed to state claims under either the First or the Fourteenth Amendments. On February 27, 2018, this Court ruled on the motion, finding the Plaintiffs had standing, dismissed their Equal Protection claim, and denied the motion in all other respects. Animal Legal Def. Fund v. Reynolds, 297 F.Supp.3d 901, 907-30 (S.D. Iowa 2018). Plaintiffs filed a Motion for Summary Judgment on June 22, 2018, ECF No. 49, which Defendants resist. Defendants filed a Cross-Motion for Summary Judgment on July 13, 2018, ECF No. 55, which Plaintiffs resist.
II. DISCUSSION
A. Jurisdiction
Because Plaintiffs bring this action under a federal statute, 42 U.S.C. § 1983, which provides relief based on violations of the United States Constitution, this Court has original jurisdiction over the claims asserted pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred within this district.
B. Standing
As noted, Defendants previously moved to dismiss this case on standing grounds. Defendants argued Plaintiffs failed to establish an injury in fact. In a lengthy discussion of organizational standing, the *820 Court found Plaintiffs had standing. Reynolds, 297 F.Supp.3d at 912-17. The Court reasoned that Plaintiffs properly alleged an injury in fact that arose from the potential enforcement of § 717A.3A, which was fairly traceable to the conduct Plaintiffs sought to enjoin, and that the relief requested would redress the alleged injuries in fact by removing the threat of legal sanction, allowing Plaintiffs to reallocate resources. Id. Recognizing this Court's ruling on standing, Defendants do not contest standing for purposes of summary judgment, but preserve the issue for any appeal. See Defs.' Cross-Mot. Br. 5 n.1, ECF No. 58-1. The Court will not repeat its standing findings, but incorporates them herein. Reynolds, 297 F.Supp.3d at 912-17.[9]
C. Summary Judgment Standard
The Federal Rules of Civil Procedure authorize "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) ; Gerlich v. Leath, 861 F.3d 697, 704 (8th Cir. 2017). On cross-motions for summary judgment, the Court evaluates each motion independently to determine whether there exists a genuine dispute of material fact and whether each movant is entitled to judgment as a matter of law. Sam's Riverside, Inc. v. Intercon Sols., Inc., 790 F.Supp.2d 965, 975 (S.D. Iowa 2011).
D. The First Amendment Claims[10]
Through its "sometimes inconvenient principles," the First Amendment limits the government's ability to make laws that restrict speech. United States v. Alvarez, 567 U.S. 709, 715, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality); see U.S. Const. amend I. Under the First Amendment, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. ACLU, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (quoting *821 Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ). The First Amendment does not protect all speech, "but if a law restricts speech that is protectable, the State must justify the law by articulating the problem it is meant to address and demonstrating that the law is properly tailored to address that problem." Herbert, 263 F.Supp.3d at 1200.
Plaintiffs maintain § 717A.3A violates the First Amendment in two ways. First, it is a content- and viewpoint-based speech restriction that fails to withstand judicial scrutiny; and second, it is overbroad.[11] Defendants contend that § 717A.3A regulates conduct, not speech; and to the extent § 717A.3A regulates speech, it only prohibits false statements that do not receive First Amendment protection. Defendants alternatively argue that if § 717A.3A does regulate protected speech, the law can withstand intermediate scrutiny.
1. Judicial Scrutiny Analysis
Generally, a free speech challenge proceeds in three stages. Id. at 1201. First, the Court resolves whether the challenged statute implicates protected speech. Id. If it does, the Court determines what level of scrutiny applies. Id. Then, the Court applies the appropriate scrutiny and confirms whether the statute satisfies the applicable standard. Id.
a. Protected Speech
The Court resolved the first question in a prior order. Speech is necessarily implicated by § 717A.3A because "one cannot violate § 717A.3Awithout engaging in speech," Reynolds, 297 F.Supp.3d at 918. The speech implicated is false statements and misrepresentations.
To some degree, the concept of constitutional protection for speech that is false may be disquieting. However, as the Supreme Court has reasoned, "[t]he Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace." Alvarez, 567 U.S. at 729-30, 132 S.Ct. 2537 (noting "few might find [the defendant]'s statements anything but contemptible," yet "his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression"). Further, not all false statements are protected speech. Id. at 721-22, 132 S.Ct. 2537.
Ultimately, in assessing falsehoods in this context, the Court engages in a legal, not moral, analysis. The Supreme Court has recognized that "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." Id. at 718, 132 S.Ct. 2537. Therefore, false statements will be protected by the First Amendment only if they do not *822 cause a "legally cognizable harm" or provide "material gain" to the speaker. Id. at 718, 723, 132 S.Ct. 2537. And, as the Court has already explained, the false statements implicated by § 717A.3A are protected speech because they do not cause either. Reynolds, 297 F.Supp.3d at 920-24 (discussing Alvarez, 567 U.S. at 717-35, 132 S.Ct. 2537 ).
Previously, Defendants offered argument to the contrary, none of which persuaded the Court.[12] Defendants now indicate they "respectfully reassert their prior arguments ... in the hope that the Court will view the arguments in a new light." Defs.' Comb. Br. 6, ECF No. 58-1. The Court, finding no reason to diverge and declining to do so, reaffirms its prior legal findings. Iowa Code § 717A.3A implicates protected speech.
b. Scrutiny
"Content-based laws-those that target speech based on its communicative content-are presumptively unconstitutional and may be justified only if the [state] proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, Ariz., --- U.S. ----, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015). In its prior order, the Court determined that "[b]oth regulations contained within § 717A.3A are content-based on their face." Reynolds, 297 F.Supp.3d at 919. Iowa's "enforcement authorities must necessarily examine the content" of an individual's statement to determine whether the individual violates the statute. See FCC v. League of Women Voters of Cal., 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). Not only must enforcement authorities know the content of the speech, but they must know the content's veracity. Iowa Code § 717A.3A is thus a content-based regulation.[13]
Given that § 717A.3A is a content-based regulation, the Court must now determine the appropriate level of scrutiny. The First Amendment requires heightened scrutiny whenever the state creates "a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). "In assessing content-based restrictions on protected speech, the Court has not adopted a free-wheeling approach, but rather has applied the 'most exacting scrutiny.' " Alvarez, 567 U.S. at 724, 132 S.Ct. 2537 (citation omitted) (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ). That is, a statute that is content *823 based on its face, as § 717A.3A is here, must be able to survive strict scrutiny. Reed, 135 S.Ct. at 2228.
Defendants urge the Court to apply intermediate scrutiny, stating that the concurring opinion in Alvarez is controlling. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (citation and internal quotation marks omitted) ). Plaintiffs, also referencing Alvarez, contend that strict scrutiny is the correct standard to apply. The parties' divergent interpretations of Alvarez, and how it should apply to this case, are understandable given that Alvarez was a plurality decision.
In Alvarez, the United States Supreme Court examined the Stolen Valor Act ("the Act"), which made it a crime for anyone to "falsely represent himself or herself" as having been awarded any decoration or medal authorized for the Armed Forces of the United States. Alvarez, 567 U.S. at 715, 132 S.Ct. 2537. The defendant, Alvarez, falsely boasted during a public meeting that he was awarded the Congressional Medal of Honor and was subsequently convicted of violating the Act. Id. at 714, 132 S.Ct. 2537. The Supreme Court invalidated the conviction and struck down the Act on First Amendment grounds. Id. at 715, 132 S.Ct. 2537.
The Court's decision was fragmented, which has led to the somewhat uncertain legal framework for analyzing regulations that proscribe false speech.[14] Justice Kennedy wrote on behalf of a four-Justice plurality, which found the Act was not narrowly tailored as strict scrutiny required. Id. at 729-30, 132 S.Ct. 2537. Justice Breyer, who was joined by Justice Kagan, concurred in the judgment, but rejected the plurality's "strict categorical analysis," and instead applied a form of intermediate scrutiny. Id. at 730, 132 S.Ct. 2537 (Breyer, J., concurring). Justice Breyer determined the Act could not survive intermediate scrutiny because "the statute work[ed] First Amendment harm, while the Government [could] achieve its legitimate objectives in less restrictive ways." Id. Justice Breyer recognized that strict scrutiny was necessary in some cases, id. at 731-32, 132 S.Ct. 2537, but he found intermediate scrutiny more appropriate where "dangers of suppressing valuable ideas are lower," such as when "the regulations concern false statements about easily verifiable facts that do not concern" more complex subject matter. Id. at 732, 132 S.Ct. 2537.
Based upon the regulation of false statements involved in the present case, this *824 Court need not determine whether the plurality opinion or the concurring opinion in Alvarez is controlling. See Marks, 430 U.S. at 193, 97 S.Ct. 990. This Court, as have other courts considering similar statutes, reaches the same conclusion under either strict or immediate scrutiny. See, e.g., Wasden, 878 F.3d at 1197-98 (applying strict scrutiny and intermediate scrutiny to a law similar to § 717A.3A(a) ); Herbert, 263 F.Supp.3d at 1209-10 (applying strict scrutiny).
c. Application of Scrutiny
i. Strict Scrutiny
When the state seeks to regulate protected speech, it bears the heavy burden of showing that the prohibition satisfies constitutional scrutiny. Alvarez, 567 U.S. at 726, 132 S.Ct. 2537. This burden is "for good reason" because "were we to give the Government the benefit of the doubt when it attempted to restrict speech, we would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting ideas." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Therefore, under strict scrutiny, a content-based law is presumptively unconstitutional and will be justified only if the state proves that the law is narrowly tailored to serve a compelling state interest. Id. at 813, 120 S.Ct. 1878.
Plaintiffs argue § 717A.3A cannot survive strict scrutiny. Defendants make no attempt to directly argue otherwise, but instead focus on all the reasons why strict scrutiny should not apply. Defendants have not met their burden.
Defendants contend § 717A.3A protects the state's interests of private property and biosecurity. As factual support, they provide the statements of three lawmakers and then-Governor Branstad. As a preliminary matter, the record makes clear that these were not the only reasons motivating the enactment of § 717A.3A. Rather, as discussed above, and as admitted by Defendants, some lawmakers also wanted to stop "subversive acts" by "groups that go out and gin up campaigns ... to give the agricultural industry a bad name."[15] Pls.' SUF ¶¶ 79-80, ECF No. 49-1. Other statements in the record illustrate that § 717A.3A serves the interest of protecting Iowa's agricultural industry from perceived harms flowing from undercover investigations of its facilities.
However, accepting Defendants' argument that property and biosecurity are the state's actual interests protected by § 717A.3A, the Court is persuaded these interests are important; but they are not compelling in the First Amendment sense. Herbert, 263 F.Supp.3d at 1211-12 (assuming, despite record evidence to the contrary, that the state's proffered interests-protection from spread of disease; injury to animals and workers caused by unauthorized actions-were the actual reasons for enacting the statute, but finding that the harms targeted were "entirely speculative," and therefore could not be considered compelling); Otter, 118 F.Supp.3d at 1207-08 (finding the state's "interest in protecting personal privacy and private property" to be important, but not compelling; furthermore, "even if the [s]tate's interest in protecting the privacy and property of agricultural facilities was 'compelling' in the First Amendment sense, [the statute] [wa]s not narrowly drawn to serve those interests").
Even if the state's proffered interests are compelling, § 717A.3A's prohibitions are not narrowly tailored to serve either interest. If the state is going to *825 restrict protected speech, the restriction must be "actually necessary" to achieve the state's compelling interest. Alvarez, 567 U.S. at 725, 132 S.Ct. 2537 (quoting Brown v. Enter. Merchs. Ass'n, 564 U.S. 786, 799, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) ). A prohibition is actually necessary if there is a "direct causal link between the restriction imposed and the injury to be prevented." Id.
Defendants have produced no evidence that the prohibitions of § 717A.3A are actually necessary to protect perceived harms to property and biosecurity. Id. at 726-27, 132 S.Ct. 2537 (stating that the government's reliance on "common sense" and not "evidence to support its claim" fails to establish the causal link necessary to show narrow tailoring); 281 Care Comm. II, 766 F.3d at 790 ("Even though the effect of election fraud or detecting the fraud itself, arguably, is a bit more amorphous and difficult to detect, only relying upon common sensibilities to prove it is taking place still falls short."). Defendants have made no record as to how biosecurity is threatened by a person making a false statement to get access to, or employment in, an agricultural production facility. Nor, in the absence of any record to the contrary, will the Court assume that biological harm turns on a human vector making a false statement unrelated to such harm in order to gain access to the facility. Protecting biosecurity is therefore purely speculative and cannot constitute a compelling state interest. 218 Care Comm. II, 766 F.3d at 787 (rejecting the state's reliance on "common sense" instead of "empirical evidence"); Herbert, 263 F.Supp.3d at 1212 (finding that a Utah law, which is almost identical to § 717A.3A(1)(a), was not "actually necessary" to achieve the state's interests of health and safety of employees and animals because the state offered no evidence that those interests were in danger, nor that the law would remedy those dangers).
Further, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." McCullen v. Coakley, 573 U.S. 464, 134 S.Ct. 2518, 2540, 189 L.Ed.2d 502 (2014). "The existence of content neutral alternatives to" protect property rights and biosecurity, " 'undercut[s] significantly' the defenses raised to the statutory content." Survivors Network of Those Abused by Priests, Inc. v. Joyce, 779 F.3d 785, 793-94 (8th Cir. 2015) (alteration in original) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ). The Court need not look far to learn that both the state's proffered interests could be served by alternative measures. As to private property and trespass concerns, an already existing section of Chapter 717A of the Iowa Code provides that persons "shall not, without the consent of the owner" do various acts, including entering the facility to disrupt or otherwise harm the operation. Iowa Code § 717A.2. With similar interests in mind, the state could also rely upon Iowa's existing trespass law, Iowa Code § 716.7(2), to protect its proffered interests without chilling speech.[16] See Wasden, 878 F.3d at 1196. Biosecurity is effectively and appropriately protected by the last section of *826 Chapter 717A, which prohibits the willful possession, transportation, or transfer of "a pathogen with an intent to threaten the health of an animal or crop." See Iowa Code § 717A.4.
Not only is § 717A.3A unnecessary to protect the state's interests, it is also an under-inclusive means by which to address them. "Where a regulation restricts a medium of speech in the name of a particular interest but leaves unfettered other modes of expression that implicate the same interest, the regulation's underinclusiveness may 'diminish the credibility of the government's rationale for restricting speech in the first place.' " Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1100 (8th Cir. 2013) (quoting City of Ladue v. Gilleo, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ). That is, an underinclusive prohibition should raise "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." Brown, 564 U.S. at 802, 131 S.Ct. 2729. Here, § 717A.3A does nothing to deter the exact same alleged harms-trespass and biosecurity breaches-from individuals who proceed to access or enter a facility without false pretense or misrepresentation.
The prohibition is also overinclusive due to its lack of sufficient limitations. Section 717A.3A(1)(a) includes no limiting features whatsoever, allowing it to apply even to the most innocent of circumstances. Cf. Alvarez, 567 U.S. at 736-37, 132 S.Ct. 2537 (Breyer, J., concurring) (finding under intermediate scrutiny that the lack of any "limiting features" should lead the court to believe that the statute "risks significant First Amendment harm"). By Defendants' own admission, § 717A.3A(1)(b) sweeps more broadly than a similar statute under Idaho law. See Wasden, 878 F.3d at 1201 (finding an Idaho law, which prohibited an individual from obtaining "employment with an agricultural production facility by force, threat, or misrepresentation with the intent to cause economic or other injury " was not subject to judicial scrutiny (emphasis added) ).[17] Here, Defendants argue that § 717A.3A's more expansive limiting feature should not be problematic because the language codifies the duty of loyalty, which they say provides that a "servant must do nothing hostile to the master's interest." Defs.' Comb. Br. 19, ECF No. 58-1 (quoting Condon Auto Sales & Serv., Inc. v. Crick, 604 N.W.2d 587, 599 (Iowa 1999) ). But, something not authorized is not necessarily something hostile to the master's interest. An employer can choose not to authorize a wide variety of conduct, none of which may actually result in a breach of the employee's duty of loyalty (or cause harm). Here, Defendants seek to greatly expand the reach of the duty of loyalty. The Iowa Supreme Court has cautioned that even a civil cause of action based on the breach of the duty of loyalty must be limited in scope. Condon, 604 N.W.2d at 600 ("[E]ven in those jurisdictions which recognize a cause of action for breach of loyalty, the action is limited in scope. A broad cause of action would give employers more protection than needed and could create an unfair advantage."). To the extent that a violation of § 717A.3A can be likened to the common law breach of a duty of loyalty, to criminalize such a breach goes far beyond what is necessary to protect the state's interests and allows for expansive prosecution.
ii. Intermediate Scrutiny
Even if the Court applies the type of intermediate scrutiny advocated for by *827 Justice Breyer and Defendants, Iowa Code § 717A.3A still fails. By its own terms, § 717A.3A"criminalizes speech that inflicts no 'specific harm' on property owners, 'ranges very broadly,' and risks significantly chilling speech that is not covered under the statute." Wasden, 878 F.3d at 1198 (quoting Alvarez, 567 U.S. at 736-37, 132 S.Ct. 2537 (Breyer, J., concurring) ). While the First Amendment doctrine permits the regulation of some categories of lies-those that cause a legally cognizable harm or material gain-it does not permit § 717A.3A, which is so broad in its scope, it is already discouraging the telling of a lie in contexts where harm is unlikely and the need for prohibition is small. The right to make the kinds of false statements implicated by § 717A.3A -whether they be investigative deceptions or innocuous lies-is protected by our country's guarantee of free speech and expression. Alvarez, 567 U.S. at 729-30, 132 S.Ct. 2537. For all of these reasons, Iowa Code § 717A.3A fails to survive judicial scrutiny.[18]
E. The Fourteenth Amendment Due Process Claim
Defendants assert they are entitled to summary judgment as to a remaining due process claim. Plaintiffs do not provide argument on this issue. The Court's prior order clarified that Count III of the Complaint, brought under the Fourteenth Amendment, included two theories, one under the Due Process Clause and the other under the Equal Protection Clause. The Court dismissed the portion of Count III alleged pursuant to the Equal Protection Clause and found the portion alleged pursuant to the Due Process Clause was subsumed by Plaintiffs' Count I, under the First Amendment. Reynolds, 297 F.Supp.3d at 926 ("The above discussion concerning First Amendment protection for the speech prohibited by § 717A.3A addresses the former theory, as the First Amendment only applies to Defendants via the Fourteenth Amendment."). The First Amendment fully addresses the claim, which cannot simultaneously survive as a Fourteenth Amendment due process claim. See Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (citation and internal quotation marks omitted) ). Therefore, Count III is now dismissed as moot.
III. CONCLUSION
Based on the foregoing, Plaintiffs' Motion for Summary Judgment, ECF No. 49, must be granted , Defendants' Motion for Summary Judgment, ECF No. 57, must be denied , and the remaining due process claim in Count III must be dismissed .
On the issues of specific injunctive relief and the claim for legal fees, the Court will await additional briefing by the parties.
IT IS SO ORDERED.

The facts set forth here are either not in dispute or viewed in the light most favorable to the nonmoving party. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

Pls.' Br. 5, ECF No. 53 (citing Anne-Marie Dorning, Iowa Pig Farm Filmed, Accused of Animal Abuse, ABC News (June 29, 2011), https://abcnews.go.com/Business/iowa-pig-farm-filmed-accused-animal-abuse/story?id=13956009).

Pls.' Br. 3, ECF No. 53 (citing McDonald's Cuts Egg Supplier After Undercover Animal Cruelty Video, L.A. Times (Nov. 18, 2011, 2:24 PM), https://latimesblogs.latimes.com/money_co/2011/11/mcdonalds-cuts-egg-supplier-after-undercover-animal-cruelty-video.html).

To establish the existence of these concerns, the parties provided statements by law-makers who were members of the Iowa legislature during the debate and passage of § 717A.3A. See Pls.' SUF ¶¶ 78-82, ECF No. 49-1; Defs.' SUF ¶¶ 1-7, ECF No. 57-1. Where other courts have relied upon similar types of statements by lawmakers, it has been for the limited purpose of providing history to enactment of a law, see, e.g., Animal Legal Def. Fund v. Wasden, 878 F.3d 1184, 1191-92 (9th Cir. 2018) ; Animal Legal Def. Fund v. Herbert, 263 F.Supp.3d 1193, 1198 (D. Utah 2017), or assessing whether the state's proffered interest served by the law was the actual interest served, see, e.g., Herbert, 263 F.Supp.3d at 1212. In the absence of formalized legislative history, and because this Court conducts no animus analysis that could require reliance on legislative commentary, see infra note 13, the Court's use of the lawmakers' statements is similarly limited to illustrating the background for the current legal dispute.

Defs.' SUF ¶ 4, ECF No. 57-1 (quoting Paul Yeager, "Ag Gag" Bill Passes Iowa Legislature, Iowa Pub. Television, (Mar. 2, 2012), http://www.iptv.org/mtom /story/13293/ag-gag-bill-passes-iowa-legislature).

Defs.' SUF ¶ 5, ECF No. 57-1 (quoting Amanda Peterka, State Legislatures Take Up Bills Barring Undercover Videos of Confined Animal Feeding Operations, N.Y. Times, (May 5, 2011), https://archive.nytimes.com/www.nytimes.com/gwire/2011/05/05/05greenwire-state-legislatures-take-up-bills-barring-under-88103.html).

Pls.' SUF ¶ 79, ECF No. 49-1 (quoting Mike Wesier, Iowa May be First to Ban Secret Video on Farms, Sioux City Journal (May 22, 2011), https://bit.ly/2kYYA9L).

An "agricultural production facility" is any "location where an agricultural animal is maintained for agricultural production purposes, including but not limited to a location dedicated to farming ..., a livestock market, exhibition, or a vehicle used to transport the animal," as well as animal research locations, veterinary facilities, kennels, and pet shops. Id. § 717A.1(3), (5). An "agricultural animal" is defined as "[a]n animal that is maintained for its parts or products having commercial value." Id. § 717A.1(1)(a).

In asserting Plaintiffs lacked standing, Defendants relied on People for the Ethical Treatment of Animals, Inc. v. Stein, 259 F.Supp.3d 369 (M.D.N.C. 2017), rev'd per curiam, 737 F. App'x 122, 130-31 (4th Cir. 2018) (unpublished), arguing Plaintiff's claimed injuries were similarly too remote and speculative to support standing. The public interest organizational plaintiffs in Stein challenged a North Carolina law that created a civil cause of action against a person who "intentionally gains access to the nonpublic areas of [another's] premises and engages in an act that exceeds the person's authority." Id. at 372 (quoting N.C. Gen. Stat. § 99A-2(a) ). The district court in Stein found the plaintiffs lacked standing, reasoning the state was not required to enforce non-criminal laws, thus private enforcement of the law against plaintiffs was premature and speculative. Id. at 383-84. While this Court found, and still maintains, that Stein is materially distinguishable from the present case based on the nature of the sanction alone, see Reynolds, 297 F.Supp.3d at 913-14, it is noteworthy that subsequent to this Court's February 27 Order, the Fourth Circuit Court of Appeals reversed and remanded Stein, holding plaintiffs sufficiently alleged an actual and well-founded fear that the North Carolina law would be enforced against them, see Stein, 737 F. App'x at 130-31.

Defendants, in their capacities as officials of the State of Iowa, are properly subject to Plaintiffs' claims under the First Amendment, as incorporated by the Fourteenth Amendment. See Murdock v. Pennsylvania, 319 U.S. 105, 108, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

In their Complaint, Plaintiffs request, inter alia , the Court (1) declare Iowa Code § 717A.3A unconstitutional on its face and as applied to Plaintiffs, (2) permanently enjoin Defendants from enforcing the statute, and (3) strike down the challenged statute in its entirety. Although Plaintiffs describe their challenge as both facial and as applied, "[t]he label is not what matters." John Doe No. 1 v. Reed, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010). "The important point is that plaintiffs' claim and the relief that would follow-[as outlined above and in Plaintiffs' Complaint]-reach beyond the particular circumstances of these plaintiffs. They must therefore satisfy our standards for a facial challenge to the extent of that reach." Id. While facial challenges under the First Amendment have, in some cases, been discouraged, see Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 791 (8th Cir. 2004), the Court finds it appropriate in this case, as in the similar cases collected supra Part I.

Notably, Defendants assert, as they did on their motion to dismiss, that the First Amendment cannot be used to trample private property rights, nor as a defense to the trampling of private property rights. They express concern for the private property owner's ability to exclude individuals without the aid of this law. As to using the First Amendment as a defense, this line of argument applies to those who violate a content-neutral law (e.g., generic trespass) and ask for shelter under the First Amendment. See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 516 (4th Cir. 1999). While that defense was discussed in regard to the motion to dismiss, see Reynolds, 297 F.Supp.3d at 920-21, the scrutiny analysis of § 717A.3A is different than the Court's prior analysis on the motion to dismiss because the challenged law is not one of general applicability, as explained infra Part II.D.1.b. Defendants' other argument, that without the aid of this law, private property rights would be wasted, is similarly inapplicable.

The parties provided argument as to whether § 717A.3A is also viewpoint-based, relying heavily on legislative commentary. Having found that the law is a content-based regulation on its face, there is "no need to consider the [state]'s justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny." Reed, 135 S.Ct. at 2227.

In 281 Care Comm. v. Arneson (281 Care Comm. II), 766 F.3d 774 (8th Cir. 2014), the Eighth Circuit determined that neither the plurality, nor the concurring opinion in Alvarez, controlled the level of scrutiny that should be applied to a Minnesota law criminalizing false campaign speech. Instead, the Arneson court held that the statute must be subject to strict scrutiny because political speech "occupies the core of the protection afforded by the First Amendment." Id. at 784. In deciding that Alvarez did not control the level of scrutiny, the court explained that "it was largely (if not solely) because the regulation at issue in Alvarez concerned false statements about easily verifiable facts that did not concern subjects often warranting greater protection under the First Amendment, that the concurring Justices applied intermediate scrutiny." Id. (citing Alvarez, 567 U.S. 731-32, 132 S.Ct. 2537 (Breyer, J., concurring) ). Precedents on "the regulation of political speech," and not Alvarez, "dictate[d] the level of scrutiny" applicable to its analysis of the Minnesota law. Id. (emphasis added).

See supra note 4.

Defendants argue that the trespass statute's penalties are clearly insufficient to prohibit trespass because the plaintiff-organizations did not seem to be deterred by them. This argument still fails to explain how amendment of the trespass statute would not adequately deter the behavior without suppressing speech. Therefore, Defendants fail to explain why the trespass law is insufficient to serve the interest of protecting property. McCullen, 134 S.Ct. at 2540.

The Court already discussed Wasden in length, finding it largely unpersuasive as to § 717A.3A(1)(b). See Reynolds, 297 F.Supp.3d at 924-25.

Plaintiffs invoke the First Amendment's overbreadth doctrine in Count II of their Complaint. Because the Court has already found § 717A.3A constitutionally invalid, it is unnecessary to determine whether the statute can survive overbreadth analysis. See United States v. Stevens, 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (indicating that traditional facial analysis and overbreadth analysis are alternatives); Rideout v. Gardner, 838 F.3d 65, 72 n.5 (1st Cir. 2016) ("Because the statute fails under intermediate scrutiny, we also need not reach the plaintiffs' argument that the statute fails under the overbreadth doctrine.").